**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TECHNIP OFFSHORE CONTRACTORS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-0096 |
| | § | |
| WILLIAMS FIELD SERVICES, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This diversity case arises out of a contract for work relating to the Devil's Tower Development Project, a floating oil and gas production facility in the United States Gulf of Mexico off the Louisiana coast. On August 13, 2001, Technip Offshore, Inc. entered into a contract with Williams Field Services-Gulf Coast, L.P. and Williams Oil Gathering, L.L.C. ("Williams"). The contract called for Technip to do engineering, procurement, installation, and commissioning work to install gas and oil pipelines and branch lines to be tied into the Devil's Tower "SPAR" using a winch. The project encountered numerous difficulties and delays. Technip filed change orders seeking additional compensation, which Williams refused to pay. In January 2004, Technip sued Williams for breach of contract and sought a declaratory judgment as to the parties' contractual rights and duties.

In an earlier Memorandum and Opinion, this court granted in part and denied in part Williams's motion to dismiss and granted in part and denied in part Technip's motion for partial summary judgment.  (Docket Entry No. 76).  This opinion addresses motions primarily focused on Williams's claim for liquidated damages.

- Both parties have moved for partial summary judgment.  (Docket Entry Nos. 82, 86).  Each party responded to the other's motion, (Docket Entry Nos. 86, 92), replied to the responses, (Docket Entry Nos. 89, 94), and filed surreplies, (Docket Entry Nos. 98, 99).

- Technip has filed an opposed motion for leave to file an amended answer to Williams's fourth amended complaint, (Docket Entry No. 117), to which Williams responded, (Docket Entry No. 117), and Technip replied, (Docket Entry No. 127).[1]

- Both parties have filed motions to exclude the other party's expert witness, (Docket Entry Nos. 118, 120), to which each party has responded, (Docket Entry Nos. 132, 133), and replied, (Docket Entry Nos. 139, 140).

- Each party has filed an additional motion for partial summary judgment (Docket Entry No. 119, 121, 123), to which the other party responded, (Docket Entry Nos. 124, 134, 135, 136), and replied, (Docket Entry Nos. 141, 142, 144).

---

[1]  Technip also filed a motion to dismiss and, alternatively, motion for partial summary judgment, (Docket Entry Nos. 115, 116), which it withdrew based on a stipulation. (Docket Entry No. 126).

After reviewing the pleadings, motions and responses, the record, and the applicable law, this courts grants the motions to exclude the expert testimony, denies Technip's motion for leave to file an amended answer, and grants in part and denies in part the motions for partial summary judgment.  The reasons for these decisions are stated below.

## I.    Background

Certain provisions in the August 13, 2001 Contract for "Engineering, Procurement, Installation, and Commissioning of Gas Export Pipeline and 101 Export Pipeline" between Williams (referred to as "COMPANY" in the contract) and Technip (referred to as "CONTRACTOR" in the contract) are important to the pending motions.   Article 2.3 specified Technip's duty to be ready to work according to the contract schedule:

> CONTRACTOR shall ensure that CONTRACTOR's vessels, equipment and personnel are at the Work site and ready to commence offshore installation and COMPANY shall ensure that COMPANY has procured all of its permits and access rights such that the pipelines can be installed in a timely manner in accordance with the schedule for the Work.  In order to assist COMPANY with the performance of its own scheduling obligations, CONTRACTOR shall provide written notification monthly to COMPANY of the commencement date for the offshore installation work by identifying periods during which the offshore installation work shall commence.

(Contract at 4–5).

Article 2.4 required Williams to send Technip a series of notices as the SPAR Access Date approached, giving progressively more precise information as to when Technip could have access to the SPAR to begin its work there.  The SPAR Access Date is defined in the contract as "[t]he date upon which the CONTRACTOR [Technip] shall be provided full

access to commence Work at the SPAR in accordance with the requirements of Articles 2.0."

(Contract at 3). The serial notice requirement was to facilitate Technip's ability to coordinate

its work with that of others involved in installing the SPAR. The contract originally set a

four-month window within which the SPAR Access Date could be set, from November 15,

2002 to March 15, 2003. Because the schedule was uncertain, the contract required that on

January 1, 2002, Williams was to tell Technip the two months in the four-month window

when the SPAR Access Date would be set. Six months before January 15, 2003—on July

15, 2003—Williams had to notify Technip of a 45-day window for the SPAR Access Date,

to be within the two-month window set by the prior notice. Four months before the midpoint

of that window, Williams had to notify Technip of a 30-day window for the SPAR Access

Date, within the 45-day window set by the prior notice. Three months before the midpoint

of that window, Williams had to notify Technip of a 15-day window for the SPAR Access

date, within the 30-day window set by the prior notice. Two months before the midpoint of

that 15-day window, Williams had to notify Technip of a 7-day window for the SPAR

Access Date, within the 15-day window set by the prior notice. Finally, one month before

the midpoint of the 7-day window, Williams had to notify Technip of a 3-day window for

the SPAR Access Date, within the seven days set by the prior notice. Article 2.4 spelled out

the diminishing-window mechanism:

> 2.4    In order to assist CONTRACTOR in interfacing CONTRACTOR's
> Work with the installation of the SPAR, which shall be performed by
> others, COMPANY shall provide written notification to
> CONTRACTOR identifying windows which contain the SPAR Access
> Date and, finally, notifying  CONTRACTOR of the SPAR Access

4

Date.  In the event CONTRACTOR is unable to meet the SPAR Access Date, or COMPANY needs to issue a window outside the window established by 2.4(d) but still within the overall window identified in 2.4(a), then both COMPANY and CONTRACTOR shall mutually agree to a new SPAR Access Date which shall not be later than the window identified in 2.4(a).

(a)     On the effective date of this Contract, the window containing the SPAR Access Date shall be November 15, 2002 to March 15, 2003.

(b)     On January 1, 2002, COMPANY shall notify CONTRACTOR of a sixty (60) day window for the SPAR, such sixty (60) day window to be entirely within the prior window.

(c)     Six (6) months prior to the midpoint of the above sixty (60) day window, COMPANY shall notify CONTRACTOR of a forty-five day window for the SPAR, such forty-five (45) day window to be entirely within the prior window.

(d)     Four (4) months prior to the midpoint of the above forty-five (45) day window, COMPANY shall notify CONTRACTOR of a thirty (30) day window for the SPAR, such thirty (30) day window to be entirely within the prior window.

(e)     Three (3) months prior to the midpoint of the above thirty (30) day window, COMPANY shall notify CONTRACTOR of a fifteen (15) day window for the SPAR, such fifteen (15) day window to be entirely within the prior window.

(f)     Two (2) months prior to the midpoint of the above fifteen (15) day window, COMPANY shall notify CONTRACTOR of a seven (7) day window for the SPAR, such seven (7) day window to be entirely within the prior window.

(g)     One (1) month prior to the midpoint of the above seven (7) day window, COMPANY shall notify CONTRACTOR of a three (3) day window for the SPAR, such three (3) day window to be entirely within the prior window.

(Contract at 5–6).  Article 2.4 also referred to an attached work schedule setting out target

5

dates.  Technip was required to provide monthly progress reports as well as daily progress reports during the fabrication and installation work.  These reports were to include an "explanation for any variances from such Work Schedule and the steps being taken by CONTRACTOR to meet the Work Schedule."  (Contract at 6).

Article 2.4 also addressed the consequences of a failure to meet the SPAR Access Date.  If Technip could not meet the specified SPAR Access Date, or if Williams had to delay a "window" but set a SPAR Access Date within the November 15, 2002 to March 15, 2003 period, the contract provided that the parties "shall mutually agree to a new SPAR Access Date which shall not be later" than the November 15, 2002 to March 15, 2003 window.  Article 2.4 did not address the circumstance that in fact occurred:  Williams issued a new SPAR Access Date later than March 15, 2003.

Article 2.6 did address the circumstance of a SPAR Access Date falling outside the November 2002 to March 2003 window.  Article 2.6 limited Technip's damages in the event of such a delay:

> 2.6    Notwithstanding the foregoing, in the event the date upon which the CONTRACTOR is provided access to commence the Work at the SPAR is not between November 15, 2002 and March 15, 2003, and CONTRACTOR's Deep Blue is actively working for another of CONTRACTOR's customers during such time, then CONTRACTOR shall obtain another vessel to complete the lift and installation of the pipeline risers and shall be reimbursed by COMPANY for such alternate vessel costs, if any, that are in excess of $275,000 per day. CONTRACTOR and COMPANY shall work together to solve this problem, should it arise, and every effort will be made to secure an alternative vessel that does not exceed $275,000 per day. CONTRACTOR shall bear all of CONTRACTOR's interface related costs, if any.

(Contract at 6).

Williams failed to provide Technip with access to the SPAR until after March 15, 2003.  Under Article 2.7, Technip's remedies "for costs . . . which may result because of delays in the SPAR Access Date" were limited to those set out in Articles 2.4, 2.5, and 2.6:

> 2.7   The remedies provided to CONTRACTOR in Articles 2.4, 2.5 and 2.6 above shall be CONTRACTOR's sole and exclusive remedy for costs, including but not limited to Standby Rate Charges, which may result because of delays in the SPAR Access Date or delays encountered by CONTRACTOR from other contractors and/or there subcontractors working on the SPAR.

(Contract at 6).

Article 8 addressed compensation to Technip.  Article 8.4 specifically addressed damages for delay not covered in Article 2.7.  Article 8.4 stated, in relevant part:

> 8.4   Except as set forth in Article 2.7 hereinbefore, COMPANY shall grant a time extension and compensate CONTRACTOR at the Standby Rate or rate schedule in Exhibit E, whichever is applicable, for all delays incurred by CONTRACTOR or its subcontractors arising out of or related to any of the following delays:
>
> . . .
>
> 8.4.3   Any failure by any member of COMPANY GROUP to perform any of its obligations which causes CONTRACTOR any actual delay in the performance of its obligations under the Contract, including, but not limited to, the delivery of all COMPANY-Furnished Materials, the procurement of all COMPANY-Permits and all other services or materials that COMPANY is obligated to provide pursuant to the provisions set forth in Exhibit A; and/or
>
> 8.4.4   Any other act or omission by any member of COMPANY GROUP which causes CONTRACTOR an actual delay.

(Contract at 18).  This provision did not apply to damages for delays covered in Article 2.7, which established remedies for "delays in the SPAR Access Date."

Article 2.5 set out Williams's duties for preparatory work:

2.5    Further to the SPAR Access Date as determined in accordance with Article 2.4 above, COMPANY shall ensure that all SPAR services and equipment, as detailed in Exhibit B, Section 4.8, are ready in all ways for use by CONTRACTOR to perform the SPAR Installation operations.  In the event such services and equipment are not available for use by CONTRACTOR, then CONTRACTOR shall not be entitled to standby rates for its vessels and equipment, however, CONTRACTOR shall be entitled to an extension of time to the period described in 23.5.1(a) equal to the period of such a delay caused by the non-availability of such SPAR services and equipment.

(Contract at 6).

Article 3.0 established procedures for changes in the work schedule:

3.0    Changes in Work

    3.1    General

    COMPANY may make changes in the Work and Work Schedule by altering, adding to, or deducting from the Work.

    3.2    Change Order Notice

    3.2.1    If, at any time, COMPANY desires to make any change in the Work, COMPANY shall so advise CONTRACTOR by telefax or in writing by delivery to CONTRACTOR of a written notice (*Change Order Notice*"), fully describing the change.  Within five (5) calendar days after receipt of the Change Order Notice, CONTRACTOR shall advise COMPANY, in writing, of CONTRACTOR's proposal for the adjustments, if any, in the compensation and/or the Work Schedule attributable to such change in the Work along with a take-off with supporting calculations and prices for such

change using one of the compensation rates described in Article 3.5 and an estimate of the change, if any, to the Work Schedule. CONTRACTOR shall not be authorized to undertake any work described in the Change Order Notice until such time as COMPANY and CONTRACTOR have executed the Change Order, or a Change Order has been issued pursuant to Article 8.3.4 hereinafter.

3.2.2   If CONTRACTOR desires to make a change in the Work or if CONTRACTOR believes that any instruction by COMPANY constitutes a change to the Work, CONTRACTOR shall so notify COMPANY by telefax or in writing and such notice shall contain CONTRACTOR's proposal for the change in the Work, and, if practicable under then existing circumstances, CONTRACTOR's proposal for the adjustment, if any, in the compensation and/or the Work Schedule attributable to such change in the Work in the same format as set forth in Article 3.2.1 above; *provided, however*, that COMPANY shall not be required to accept any change proposed by CONTRACTOR.   If CONTRACTOR believes COMPANY has unreasonably rejected a change proposed by CONTRACTOR on the basis that a COMPANY instruction constituted a change to the Work, then Article 24 shall be used to resolve the disagreement.

3.3   Change Order

3.3.1   A Change Order will be issued to CONTRACTOR by COMPANY for changes in the Work required by a Change Order Notice pursuant to Article 3.2.1, or by an accepted proposal for a change in Work by CONTRACTOR pursuant to Article 3.2.2 ("Change Order").

3.3.2   If such change in Article 3.3.1 is outside of the Design Basis set forth in Exhibit B and will result in an adjustment in the compensation and/or Work Schedule, then such change in Work will be authorized upon

9

COMPANY's execution of a document describing the change in Work and the compensation and/or Work Schedule for Extra Work ("Extra Work").

3.3.3   If such change in Article 3.3.1 above is within the Design Basis, Exhibit B, of the Contract, then such change in the Work also shall be authorized upon COMPANY's execution of a document describing the change in the Work but without adjustments in compensation and/or Work Schedule.

3.4   Change Order Administration

3.4.1   The COMPANY Representative shall have the authority to sign periodic Work Logs, on behalf of COMPANY, representing the use of equipment, materials and personnel.  IN the event that a lump sum price has not been utilized as the basis for the determination of CONTRACTOR's compensation for Extra Work, then these daily Work Logs shall serve as the basis for the calculation of such compensation for Change Order work.

3.4.2   Subject to any mutually agreed upon special terms and conditions established by the Change Order, all Work performed pursuant to a Change Order shall be performed in accordance with the terms and conditions of this Contract.

(Contract at 6–8 (emphasis in original)).[2]

Article 23.5 is a liquidated damages provision:

23.5.1 Pipeline(s)/SPAR connections

(a) Should CONTRACTOR fail to achieve Substantial Completion of the Work by the later of either 02 March 2003 or the SPAR Access Date plus fifty-one (51) days, the COMPANY may assess as liquidated

---

[2]  Article 3.5, "Change Order Compensation Disputes," is omitted.

damages (LD), but not as a penalty, an amount of money per day equal to the LD value calculated in accordance with the mechanism below, for every day that the Work is not so completed, but only up to and not in excess of the aggregate maximum amount of ten percent (10%) of the Contract Sum, above which amount COMPANY agrees to release CONTRACTOR.  For purposes of this clause, the fifty-one (51) day schedule will not be extended by events of Force Majeure in Article 20.0, except to the extent the aggregate of Force Majeure days occurring prior to the SPAR Access Date exceeds fifteen (15) days.

| Day of delay | LD Value per Day ($) |
|--------------|----------------------|
| 01-30 | $100,000 |
| 31-60 | $200,000 |
| 61-75 | $300,000 |

23.5.2 Sole Remedy

COMPANY and CONTRACTOR agree that the liquidated damages assessed under 23.5.1 above represent the reasonable pre-estimate of COMPANY's actual damages, which are difficult or impossible of calculation and that the terms applicable to liquidated damages in this Article are COMPANY's sole and exclusive remedy for any late delivery of the Work.

(Contract at 36).

The parties agree that Technip had "substantially completed" its work on the SPAR on April 22, 2004.  Williams claims that it provided Technip a SPAR Access Date in accordance with the contract and provided Technip actual SPAR access on January 27, 2004. Technip disputes the claims, arguing that any SPAR Access date outside the November 15, 2002 to March 15, 2003 window is contractually invalid; that Williams had no right to set the SPAR Access Date outside this window without Technip's agreement; that Williams did not give Technip access to the SPAR until February 18, 2004; and that even assuming Williams could collect liquidated damages despite its own contract breaches, Williams's

liquidated damages claim fails because the earliest possible valid SPAR Access Date was April 8, 2004, meaning that Technip achieved substantial completion before the 51-day deadline set under Article 23.5.1.  Technip also argues that even though Williams provided actual SPAR access on February 18, 2004, Technip was prevented from beginning work until March 17, 2004 because Williams had failed to give Technip adequate notice.  These arguments are the basis of the cross-motions for partial summary judgment.

### B.    The Motions to Exclude Expert Testimony

Both parties submitted expert reports with their motions and each has filed motions to exclude the other's expert reports.  (Docket Entry Nos. 118, 120).  Both parties' experts opine on what the contract means.  Federal Rule of Evidence 702 permits expert testimony if it "will assist the trier of fact to understand the evidence or determine a fact issue."  An expert witness may not provide legal conclusions.  FED. R. EVID. 704 Committee Note.  As with any other witness, testimony offered under Rule 702 may be excluded if its probative value is substantially outweighed by the likelihood of confusion or needless presentation of cumulative evidence.  FED. R. EVID. 403.  Additionally, expert testimony—like any testimony—must be relevant, meaning that it must be probative of a disputed issue.  *See* FED. R. EVID. 401; *United States v. Angleton*, 269 F. Supp. 2d 892, 893 (S.D. Tex. 2003).

As both parties correctly argue in attempting to exclude the other's expert, contract interpretation is a legal question for the court to decide.  Parties may present legal arguments and opinions to courts through briefs in support of motions, but expert opinions on legal questions are unnecessary and inappropriate.  *See, e.g.*, *Interstate Contracting Corp. v. City*

*of Dallas*, 407 F.3d 708, 712 (5th Cir. 2005)  ("Under Texas law, determining whether a contract is unambiguous and interpreting an unambiguous contract are questions of law.") (citing *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 456 (5th Cir.2003)); *Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1096 n.5 (5th Cir. 1995) ("The interpretation of a contract is a question of law for the court. Any reliance on th[e] 'expert' opinion by the court below was misplaced.").  Both parties' Rule 702 witnesses provided opinions about how this court should the interpret the contract and what damages were owed under that interpretation.  This testimony is not helpful to resolving the factual disputes.  The experts' testimony instead offers opinions on what the contract means, which is a legal question for this court to determine.  Had this court found the contract at issue to be ambiguous, the testimony may have been both relevant and useful.  In the absence of ambiguity, however, it is neither.[3]  The testimony on damages is similarly unhelpful because the damages can be determined as a matter of arithmetic computation without the aid of expert testimony.  *Cf. Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614, 630–31 (5th Cir. 1983). (discussing the use of expert testimony to perform calculate complex damages).  Once fact witnesses permit a determination of the appropriate starting and end points for the calculation, calculation of the specific damages is a ministerial act.

The motions to exclude the expert testimony are granted under Federal Rules of Evidence 401, 403, and 702.

---

[3]  Because this court grants both motions to strike on these grounds, this court will not address the additional reasons supporting the respective motion to strike.

## II.     The Motions for Partial Summary Judgment

### A.     The Applicable Legal Standards

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Bourdeaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir. 2005).  "An issue is material if its resolution could affect the outcome of the action."  *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002). When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force,* 379 F.3d 293, 305 (5th Cir. 2004). The nonmovant must do more than show that there is some metaphysical doubt as to the material facts. *Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

The parties agree that Texas law applies. Under Texas law, in interpreting a contract, the court's primary concern "is to ascertain and to give effect to the intentions of the parties as expressed in the instrument." *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). To achieve this objective, the court considers the contract

as a whole.  *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("This court is bound to read all parts of a contract together to ascertain the agreement of the parties.  The contract must be considered as a whole . . . [and] each part of the contract should be given effect.").  When considered as a whole, a contract is ambiguous only if "it is reasonably susceptible to more than one meaning."  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).  As Texas courts have recognized, "not every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity."  *Forbau*, 876 S.W.2d at 134.  A court will not find a contract ambiguous if it may properly be given a certain legal meaning or interpretation.  *See Nat. Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995).

### B.    The Cross-Motions for Summary Judgment on Liquidated Damages and SPAR Access

In its motion for partial summary judgment, Technip contends that Williams is not entitled to liquidated damages because Williams failed to provide Technip with SPAR access under the diminishing-window mechanism set out in Article 2.0.  (Docket Entry No. 82).  Technip contends that compliance with the diminishing-window mechanism is a condition precedent to recovering liquidated damages, which Williams failed to meet.  Technip also argues that Article 2.6 did not give Williams unilateral authority to set the SPAR Access Date, but required both parties to agree.

Williams responded to Technip's motion and filed a cross-motion for partial summary judgment.  Williams argues that it provided a valid SPAR Access Date under the contract and

that it is entitled to $4 million in liquidated damages because Technip failed to complete its work on the SPAR by the designated deadline of 51 days after January 22, 2004. (Docket Entry Nos. 85, 86). Technip disputes Williams's contract interpretation and contends that because Williams failed to give Technip a change order for the SPAR Access Date, Williams cannot use the purported SPAR Access Date January 22, 2004 to claims that Technip failed to complete its work and must pay liquidated damages. (Docket Entry No. 89). In response to Williams's motion, Technip raises a new argument that the liquidated damages provision is an unenforceable penalty. (Docket Entry No. 92). Technip further contends that, as a matter of law, Williams failed to establish entitlement to $4 million in liquidated damages and that fact issues persist over the trigger date for Technip's performance obligation under the contract. (*Id.*). Williams disputes Technip's claim that compliance with the diminishing-window mechanism was a condition precedent to Williams's ability to recover liquidated damages, contends that Technip waived the argument that the liquidated-damages provision is unenforceable by failing to raise it as an affirmative defense, and argues that undisputed summary judgment evidence mandates an award of $4 million in liquidated damages in its favor. (Docket Entry No. 94). Technip filed a supplemental brief to amplify its claim that the liquidated damages provision is unenforceable. (Docket Entry No. 123). Williams responded, (Docket Entry Nos. 135, 142), and Technip replied (Docket Entry No. 144).

This court agrees with Williams that the contract did not require notice under the diminishing-window mechanism because the SPAR Access Date fell outside the contractual window. As a result, Williams is owed liquidated damages if Technip failed to comply with

the Article 23.5.1 deadlines for completing work on the SPAR. This court agrees with Technip that disputed issues of fact material to determining when Technip actually obtained full access to the SPAR remain.

Technip argues that Williams's failure to comply with the Article 2.4 diminishing-window timetable made the January 22, 2004 SPAR Access Date, which Williams gave Technip on December 31, 2003, ineffective. (Docket Entry No. 82 at 12). Article 2.4(d) required Williams to provide Technip with a 30-day window for SPAR access, four months in advance. If Article 2.4(d) applies to the January 22, 2004 SPAR Access Date, Technip's argument would be valid because Williams did not give Technip a 30-day window but instead provided a date that was less than a month away. As this court noted in its earlier Memorandum and Opinion, however, Article 2.4 does not apply to a SPAR Access Date after March 15, 2003. Instead, Article 2.6, which explicitly contemplates the scenario that transpired—Williams's inability to provide a SPAR Access Date before March 15, 2003—governs. Article 2.6 states:

> Notwithstanding the foregoing, in the event the date upon which the CONTRACTOR is provided access to commence the Work at the SPAR is not between November 15, 2002 and March 15, 2003, and CONTRACTOR's Deep Blue is actively working for another of CONTRACTOR's customers during such time, then CONTRACTOR shall obtain another vessel to complete the lift and installation of the pipeline risers and shall be reimbursed by COMPANY for such alternate vessel costs, if any, that are in excess of $275,000 per day. CONTRACTOR and COMPANY shall work together to solve this problem, should it arise, and every effort will be made to secure an alternative vessel that does not exceed $275,000 per day. CONTRACTOR [Technip] shall bear all of CONTRACTOR's interface related costs, if any.

18

(Contract at 6).  Article 2.4's carefully-crafted timetable applies only if the Spar Access Date falls within the November 15, 2002 to March 15, 2003 window.  That window had already closed by DATE, when Williams notified Technip of the January 22, 2004 SPAR Access Date.  Article 2.4(a) limits the diminishing-window mechanism to the November 2002 to March 2003 period: "On the effective date of this contract, the window containing the SPAR Access Date shall be November 15, 2002 to March 15, 2003."  (Contract at 5).  Article 2.4 requires the parties to agree on a SPAR Access Date if it is expected to be later than the initial period prescribed by Article 2.4(d), "but still within the overall window identified in 2.4(a)," November 15, 2002 to March 15, 2003.  (*Id.*).  Articles 2.4 and 2.6 do not conflict.  Reading the contract as a whole, Williams did not have to comply with Article 2.4 if the SPAR Access Date fell outside this window, which is precisely what occurred.

The other contract provisions Technip cites do not support a contrary reading.  Article 2.5, for example, is specifically linked to Article 2.4 and further limits Williams's liability.  Although Article 2.5 refers to choosing the SPAR Access Date "in accordance with Article 2.4," the provision focuses on the remedies available to Technip if Williams did not adequately prepare the SPAR for Technip's access.  (*See* Contract at 6).  In the event that Williams notified Technip under the Article 2.4 diminishing-window mechanism but the SPAR was not in fact ready for Technip, Article 2.5 would limit Technip's remedy to tolling the period during which Technip had to complete its work or pay liquidated damages.  Technip could not recover standby costs for that period of delay.  (*Id.*).

This contract interpretation would not permit Williams to set the SPAR Access Date

19

outside the diminishing-window period and escape liability for delay if Technip could not

access the SPAR on the specified date, because the contract's definition of SPAR access

required Technip to have "full access" to the SPAR.  Article 2.5 did not need to define the

parties' obligations to provide and obtain SPAR access because the definitions section and

section 4.8 of Exhibit B, which provided a more specific work schedule and obligated

Williams to provide Technip full access to the SPAR, accomplished this task.  Instead,

Article 2.5 limited Technip's remedies in the event the SPAR Access Date fell during the

window set under Article 2.4 and Williams prevented Technip from achieving full access.

Technip argues that the "Work Schedule" definition's reference to Article 2.5

incorporated Article 2.4's diminishing-window mechanism into the Work Schedule.  (Docket

Entry No. 89 at 19).  The definition for "Work Schedule" reads:

> The schedule as more fully described in Article 2.5, Article 6.0
> and Exhibit A attached hereto, and including, without limitation,
> the starting date and Delivery Date for the Work, or portions
> thereof.

(Contract at 4).  Article 6.0 elaborates on the definition of "substantial completion," and

Exhibit A sets a more specific work schedule.  Article 2.5 limits Williams's liability to

Technip if certain defined events occur.  Article 2.5 refers to Section 4.8 of Exhibit B, which

itself establishes a more specific work schedule for the SPAR.  Article 2.5 did not set a work

schedule (or at least did not set a work schedule bound to Article 2.4).  It states:

> Further to the SPAR Access Date as determined in accordance
> with Article 2.4 above, COMPANY shall ensure that all SPAR
> services and equipment, as detailed in Exhibit B, Section 4.8,
> are ready in all ways for use by CONTRACTOR to perform the

SPAR Installation operations.

(Contract at 6).  At most, Article 2.5 clarified the parties' obligations with respect to the work to be completed on the SPAR.   As with Article 2.4, the "Notwithstanding the foregoing" clause at the beginning of Article 2.6  separated the situation addressed in Article 2.6—a SPAR Access Date after March 15, 2003—from the situation described in Article 2.4—a SPAR Access Date falling between November 15, 2002 and March 15, 2003.  The same clause distinguished between these two circumstances in Article 2.5.  Finally, if the parties intended to incorporate Article 2.4 as a bedrock requirement within the contractual definition of "Work Schedule," the parties could have incorporated Article 2.4 specifically in the "Work Schedule" definition, as they did with Article 2.5.  The parties' decision not to add this clause to the "Work Schedule" definition indicates an agreement to let the various contractual provisions relating to SPAR access, including Article 2.6, control.

The liquidated-damages provision, Article 23.5, also supports this court's contract interpretation.  The liquidated-damages provision establishes a deadline for Technip to achieve "substantial completion" of its work on the SPAR and sets damages in the event "substantial completion" does not occur within that deadline.  Notably, the deadline contemplates Technip not having SPAR access by March 2003; the deadline requires Technip to attain "substantial completion" by "the later of 2 March 2003 or the SPAR Access Date plus 51 days."  (Contract at 36.)  Like the rest of the contract, the liquidated-damages provision incorporates the possibility that delays during the elaborate construction plan could push the SPAR Access Date beyond the window established in Article 2.4 and adjusts the

parties' rights and obligations accordingly.

Technip argues that Williams did not establish a valid SPAR Access Date because it failed to issue a change order under Article 3.0. Technip relies on the contract provisions governing work orders and change orders to bolster its claim that the diminishing-window mechanism within Article 2.4 was mandatory regardless of when the SPAR Access Date fell. (Docket Entry No. 89 at 13). Technip argues that two letters from a Williams project manager, Tim Oberlender, are admissions that the parties had to execute a formal change order to avoid using the diminishing-window mechanism to set the SPAR Access Date. In the first letter, dated December 10, 2002, Oberlender attaches a draft of an amended diminishing-window notification schedule for Technip and the other contractors involved. (Docket Entry No. 89, Ex. A-5). The letter states in part:

> Based upon our current information, we believe the attached Window Notification Vehicle is the most appropriate planning method for SPAR Access and completion of the Canyon Chief and Mountaineer Pipelines. We also recognize that this will result in a change order to the dates in the original schedule shown in Article 2.4 of the Contract as well as possible language modifying the notification schedules. Consequently, we want to assure [Technip] that costs if necessary for an alternate vessel to Deep Blue per Article 2.6 will be available to the extent possible, and that an extension of time to liquidated damages per Article 2.5 and 23.5.1 will also be issued as applicable. However at the same time, Williams wants to further note, that contrary to [Technip's] E-FAX Letter of November 26, 2002, this circumstance of the SPAR Access Date being outside the original window was specifically contemplated by the parties during formation of the Contract, and intentionally addressed in Article 2.6 and further confirmed in Article 2.7 which set forth the negotiated limitations on CONTRACTOR' remedies therefore.

(*Id.*).  The second Oberlender letter, dated April 8, 2003, includes the same paragraph with more specific dates.  (Docket Entry No. 89, Ex. A-7).

These letters do not admit that Williams had to obtain Technip's agreement to stop following the diminishing-window notification timetable set in the contract or to change the timetable.  To the contrary, while these letters indicate Williams's willingness to institute a new notification-window agreement with Technip that reflected the delays in the project, they do not admit that Technip's agreement was required to permit Williams to deviate from the contractual diminishing-window notification timetable.  Oberlender stated Williams's position in the letters:  the revised notification windows could help the parties best estimate when Technip would have SPAR access and would minimize the damages Williams would be required to pay if the *Deep Blue* was not available; but because the parties had contemplated this delay in the original contract through Article 2.6, the new schedule did not depart from the original "Work Schedule."  The contract  contemplated that Technip could receive SPAR access after March 15, 2003.  Williams did not request additional work from Technip once the SPAR was available. Williams complied with the access obligation by giving Technip "full access" to the SPAR.   This court agrees with Williams that because Technip's proposed work did not change,  the parties did not need to execute a change order under Article 3.0 to set a SPAR Access Date after March 15, 2003 without using the diminishing-window notification timetable.

Technip argues that Williams had to comply with Article 2.4 as a condition precedent to recovering liquidated damages.  (Docket Entry No. 82 at 20).  To recover liquidated

damages for a contract breach, the nonbreaching party must show that: (1) a breach of contract for which liquidated damages are recoverable has occurred; and (2) the nonbreaching party has met all contractual prerequisites to recovering under the liquidated damages provision. *See Assoc. Indemnity Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 283 (Tex. 1998); *Clear Lake City Water Auth. v. Kirby Lake Dev., Ltd.*, 123 S.W.3d 735, 745 (Tex. App. – Houston [14th Dist.] 2003, writ denied).  "A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement." *Clear Lake City Water Auth.*, 123 S.W.3d at 745 (citing *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976)).  "Conditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty." *Id.*

The liquidated damages provision, Article 23.5.1, is not conditioned on compliance with Article 2.4.  Instead, the provision permits Williams to recover liquidated damages if Technip failed to achieve "substantial completion" by either March 2, 2003 or the SPAR Access Date plus 51 days.  (Contract at 36).  Article 2.6, not Article 2.4, applied to setting the SPAR Access Date after March 15, 2003.  The conditions precedent to Williams's ability to recover liquidated damages were:  (1) compliance with the Article 2.6 requirements; and (2) providing Technip "full access" to the SPAR.  Technip's argument that Article 2.4 should be enforced even after March 15, 2003 has no basis in the contract language or structure.

Technip claims that because Williams breached the contract by abandoning the

24

Article 2.4 notice mechanism, it cannot enforce the liquidated-damages provision. (Docket Entry No. 89 at 15). Technip alleges that Williams stopped following the notice scheme beginning April 8, 2003. Even assuming this allegation is true, Technip has not shown that Williams breached the contract by abandoning the notice requirement at this point. As discussed above, the contract defined the diminishing-window notice mechanism as covering the period from November 15, 2002 through March 15, 2003. Technip concedes that Williams complied with this requirement by issuing notices on January 1, 2002, August 14, 2002, and October 25, 2002 (when Williams informed Technip that the SPAR Access Date would fall outside the window set in Article 2.4). After March 15, 2003, Williams had no obligation to comply with the diminishing-window mechanism. Williams's decision to end compliance with the diminishing-window mechanism on April 8, 2003—which is later than March 15, 2003—did not breach the contract. Similarly, Williams's refusal to resume a similar countdown mechanism with Technip after March 15, 2003 did not breach the contract. Contrary to Technip's argument, this contract interpretation does not make Article 2.4 meaningless. Article 2.4 imposed rights and obligations on both parties relating to the Spar Access Date from November 15, 2002 through March 15, 2003. Once that period ended, Article 2.6 controlled the parties' obligations with respect to the SPAR Access Date.

Alternatively, even if Williams had breached the contract by failing to follow Article 2.4's diminishing-window notice mechanism, Technip continued to perform under the contract and has asserted numerous causes of action to enforce it. "If the non-breaching party elects to treat the contract as continuing and insists the party in default continue

25

performance, the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties." *Gupta v. E. Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 756 (Tex. App. – Houston [14th Dist.] 2004, pet. denied). Technip continued to perform under the contract and sought damages from Williams for alleged contract violations occurring after March 2003. Because Technip continued to perform under the contract and continued to demand performance by Williams, even if Williams had breached Article 2.4 by failing to comply with the diminishing-window notification mechanism after March 15, 2003, Williams could continue to seek liquidated damages from Technip under the terms established in Article 23.5.1

In its response to Williams's motion for partial summary judgment on liquidated damages, Technip claimed that the liquidated-damages provision is an unenforceable penalty. (Docket Entry No. 92). Technip did not assert this argument in its four amended answers. Technip did not seek leave to file another amended answer until after discovery had closed, Williams had already moved for summary judgment on liquidated damages, and Technip had already filed a response in which it failed to claim that the provision was an unenforceable penalty. Rule 8(c) requires a party to plead all matters constituting an avoidance or affirmative defense. Fed. R. Civ. P. 8(c). Failure to raise an affirmative defense in a responsive pleading waives the defense. A bankruptcy court in this circuit recently examined this requirement issue in the context of the same affirmative defense at issue here:

> An affirmative defense not pled is considered waived. *See Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999); *Marine Overseas Servs., Inc. v. Crossocean Shipping Co., Inc.*, 791 F.2d 1227, 1233 (5th Cir. 1986); *Trinity Carton Co. v.*

26

*Falstaff Brewing Corp.*, 767 F.2d 184, 193–94 (5th Cir. 1985); *see also Campania Mgmt. Co., Inc. v. Rooks, Pitts & Poust*, 290 F.3d 843, 852 (7th Cir. 2002) ("A party cannot obtain recovery or base its affirmative defense on legal theories that are not contained in the pleadings.") (citing *Grain Traders Inc. v. Citibank*, 160 F.3d 97, 105 (2d Cir. 1998) and *Ins. Co. of N. Am. v. Moore*, 783 F.2d 1326, 1327–28 (9th Cir. 1986)).  Federal procedural law governs whether a particular defense is an affirmative defense that must be specifically pled.  *See Glass Containers Corp. v. Miller Brewing Co.*, 643 F.2d 308, 313 (5th Cir. 1981) (federal procedural law also applies in diversity actions) ("Since the requirement to plead an affirmative defense is a procedural rule, it is governed . . . by the Federal Rules."). Federal Rule of Civil Procedure 8(c) provides a non-exclusive list of the affirmative defenses that must be "set forth affirmatively," such as "accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by a fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense."  FED. R. CIV. P. 8(c) (emphasis added). Courts have held that a contention that a liquidated damages provision is unenforceable because it is a penalty is an affirmative defense that the contending party must plead and prove.  *See Pace Commc'ns, Inc. v. Moonlight Design, Inc.*, 31 F.3d 587, 594 (7th Cir. 1994) (party asserting penalty clause defense bears burden of pleading and proving); *Knapp Shoes, Inc. v. Sylvania Shoe Mfg.*, 15 F.3d 1222, 1227 (1st Cir. 1994) (statutory provision limiting damages is an affirmative defense for purposes of FED. R. CIV. P. 8(c)).

Moreover, the key to determining the sufficiency of pleading an affirmative defense is whether it gives the claimant fair notice of the defense.  *See Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999); *Automated Med. Labs. v. Armour Pharm. Co.*, 629 F.2d 1118, 1122 (5th Cir. 1980); *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir.1979).  The fair notice pleading requirement is met only if the defendant "sufficiently articulated the defense so that the plaintiff was not a victim of unfair surprise."  *Home Ins. Co. v. Matthews*, 998 F.2d 305, 309 (5th Cir. 1993) (citing *Bull's Corner Rest. v. Director, FEMA*, 759

> F.2d 500, 502 (5th Cir. 1985)).   The Fifth Circuit applies a
> fact-specific analysis to determine whether the defendant gave
> fair notice of the defense or whether the defendant created unfair
> surprise and thus waived the defense.   *See Woodfield v.
> Bowman*, 193 F.3d 354, 362 (5th Cir. 1999); *Ingraham v. United
> States*, 808 F.2d 1075, 1079 (5th Cir. 1987); *Marine Overseas
> Servs., Inc. v. Crossocean Shipping Co.*, 791 F.2d 1227, 1233
> (5th Cir. 1986); *Automated Med. Labs. v. Armour Pharm. Co.*,
> 629 F.2d 1118, 1122 (5th Cir.1980).

*In re Snelson*, 305 B.R. 255, 262–63 (Bkr. N.D. Tex. 2003).  Because Technip did not raise

the affirmative defense in its answer, it may not rely on it in responding to Williams's motion

for summary judgment. *Den Norske Stats Oljeselskap, A.S. v. Hydrocarbon Processing, Inc.*,

992 F. Supp. 913, 915 (S.D. Tex. 1998).

Technip cites *Phillips v. Phillips*, 820 S.W.2d 785 (Tex. 1991), to support its position

that the unenforceability of the liquidated damages provision is not an affirmative defense

that had to be pleaded or waived.  In *Phillips*, Texas Supreme Court stated that under Rule

94 of the Texas Rules of Civil Procedure, the "illegality" defense to a liquidated-damages

provision is not an affirmative defense that must be pleaded or waived.  *Id.* at 789.  The

Texas Rules of Civil Procedure do not apply in federal court.  *Erie R. Co. v. Tompkins*, 304

U.S. 64 (1938); *Times-Picayune Pub. Corp. v. Zurich Am. Ins. Co.*, 421 F.3d 328, 334 (5th

Cir. 2005).  Cases decided under the applicable Federal Rule of Civil Procedure, not the

*Phillips* case applying the Texas Rules, control whether the unenforceability of the

liquidated-damages provision is an affirmative defense that must be pleaded or waived.  The

controlling federal case law cited above supports Williams's argument that Technip's

"illegality" challenge to the contract's liquidated-damages provision is an affirmative defense

that must be pleaded or waived.

This court agrees with Williams that Technip waived the defense that the liquidated-damages provision is unenforceable as an illegal penalty.  Technip's motion for leave to file the amended answer is denied.  Technip did not move to amend its answer to raise this defense until after the close of discovery and after Williams had already filed a motion for summary judgment.  Allowing such a late pleading amendment would unfairly surprise and prejudice Williams.  *Cf. Woodfield*, 193 F.3d at 362; *Ingraham*, 808 F.2d at 1079.

Technip cites Rule 11 to argue that it did not have "sufficient evidence" to assert the affirmative defense earlier.  Rule 11 limits parties to raising defenses that "are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law" and to asserting allegations and factual contentions that "have evidentiary support or, if specifically so identified, are likely to have evidentiary support *after* a reasonable opportunity for further investigation or discovery." FED. R. CIV. P. 11(b)(emphasis added).  Rule 11 would have permitted Technip to include in its answer the legal defense that the liquidated damages provision was unenforceable as a penalty.  If Technip had to add supporting factual contentions for which it lacked evidentiary support when it filed its answer, Technip could have identified those contentions as likely to have evidentiary support after a reasonable opportunity for investigation or discovery.  Additionally, Technip first raised the affirmative defense in response to Williams's motion for summary judgment filed on July 5, 2005, before the discovery Technip now relies on to support the defense.  In other words, Technip had the same

29

evidentiary basis for raising the unenforceability defense on July 5, 2005 as it had on February 24, 2005, when it filed its fourth amended answer without pleading the affirmative defense.  The motion for leave to file an amended answer is denied; Technip cannot assert that the liquidated damages provision is an unenforceable penalty.

Texas substantive law provides further support for rejecting the challenge to the liquidated-damages provision on the merits.  The provision includes a joint stipulation that it represents "the reasonable pre-estimate of COMPANY's actual damages, which are difficult or impossible of calculation." (Contract at 36).  Such a provision appears to meet all of the requirements of enforceability under Texas law.  *See Phillips*, 820 S.W.2d at 788 ("In order to enforce a liquidated damages clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation.") (quoting *Rio Grande Valley Sugar Growers, Inc. v. Campesi*, 592 S.W.2d 340, 342 n.2 (Tex. 1979)).

The record shows that Williams complied with Article 2.6 by providing Technip with "full access" to the SPAR, but after March 15, 2003.  Because the SPAR Access Date occurred after March 15, 2003, Williams did not need to provide Technip notice in accordance with the diminishing-window mechanism provided in Article 2.4.  The summary judgment record includes a "substantial completion" date of April 22, 2004, which the parties do not dispute Technip met.  The parties also agree that Technip's "full access" to the SPAR was continuous once Williams provided that access.  The actual date when Technip received full access to the SPAR, however, is disputed.  Williams argues that it gave Technip the

30

initial SPAR Access Date of January 22, 2004, but because another contractor was working on the SPAR at that time, full access was not actually available until January 27, 2004. If Williams is correct, under the liquidated damages provision, Williams is entitled to $4 million in liquidated damages under Article 23.5.1. Technip contends that Williams did not provide full access to the SPAR until February 8, 2004. If Technip is correct, Williams is entitled to recover $2.3 million in liquidated damages, because the SPAR Access Date plus 51 days would be March 30, 2004, and Williams would be entitled to $100,000 for each of the 23 days from that date to April 22, 2004 under Article 23.5.1.

Although the date on which Williams provided Technip with full SPAR access is disputed, some of Technip's alternative arguments as to the date can be resolved on summary judgment. Technip argues in the alternative that Williams did not provide full access to the SPAR until February 18, 2004, when the pull-in winches were ready for use. Technip also argues that it did not have full access to the SPAR until March 22, 2004, when the *Deep Blue* actually arrived. Both arguments fail as a matter of law. Section 4.8.2 of Exhibit B to the contract stated, "CONTRACTOR [Technip] is to supply the pull-in winch required on the SPAR to assist with the installation and final hook-up of the SCR's onto the SPAR." (Contract, Ex. B at 16). The contract made Technip, not Williams, responsible for supplying the pull-in winch. Similarly, Article 2.6 expressly contemplated the possibility that the *Deep Blue* would not be available on the SPAR Access Date, required the parties to work together to select an alternative vessel, and allowed Technip to recover damages for any costs in

excess of $275,000 per day necessary to pay for an alternative vessel.  The *Deep Blue*'s unavailability did not permit Technip to toll the deadline for achieving "substantial completion."

Technip's motion for summary judgment is denied.  Williams's cross-motion for summary judgment is granted in part and denied in part.  This court will conduct a bench trial to determine when Williams gave Technip "full access" to the SPAR.  Liquidated damages, if any, will then be calculated under Article 23.5.1 of the contract using April 22, 2004 as the date of "substantial completion."

### C.    Technip's Motion for Summary Judgment as to Certain of Williams's Affirmative Defenses

In its motion for partial summary judgment, Technip asks this court to dismiss Williams's affirmative defenses of failure to complete conditions precedent, estoppel, waiver, breach of contract, fraudulent inducement, and release.  (Docket Entry No. 119).  In response, Williams argues that Technip's motion is conclusory and should be denied on that basis.  (Docket Entry No. 134).

"Simply filing a summary judgment motion does not immediately compel the party opposing the motion to come forward with evidence demonstrating material issues of fact as to every element of its case."  *Russ v. Int'l Paper Co.*, 943 F.2d 589, 591 (5th Cir. 1991). The moving party must first demonstrate that there are no factual issues warranting trial and point to specific deficiencies in the nonmoving party's case before the nonmoving party must respond.  *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993) (citing *Celotex*, 477 U.S. at 328 (White, J., concurring)).  "[A] mere conclusory statement that the other side has no evidence

is not enough to satisfy the movant's burden." *Id.* at 544.  Technip's motion for partial summary judgment relies on such conclusory statements and asserts the Texas "no evidence" procedural device, which does not apply under Rule 56 of the Federal Rules of Civil Procedure.  Technip correctly identifies the controlling Rule 56 standard in its motion and its reply, but does not identify record evidence to support its arguments.  Because Technip has not met its initial burden under Rule 56, its motion for partial summary judgment is denied.[4]

### D.   Williams's Motion for Summary Judgment as to Certain of Technip's Claims

Williams has moved for summary judgment on Technip's remaining claims of breach of contract, set out in Counts 11 through 15 and 26 of the Fourth Amended Complaint. (Docket Entry No. 121).   Williams argues that: (1) the claims based on Change Order Requests ("CORs") 23 Revision 1 ("23.1"), 26, and 27 are premised on Williams delaying the SPAR Access Date, which it did not; (2) Technip expressly agreed that Williams was not responsible for purchasing the BAR insurance policy; and (3) the liquidated damages sought in CORs 24 and 25 cannot be recovered.  (Docket Entry No. 121).   In response, Technip argues that Williams never issued a SPAR Access Date in compliance with the contract, barring Williams from recovering liquidated damages.  Technip also argues  that it did not waive the right to recover for additional BAR insurance premiums.  Finally, Technip argues that Article 3.0, not Article 8.5.2, controls change order requests.  (Docket Entry No. 136).

---

[4]  In light of this court's decision on Williams's later-filed motion for summary judgment, (Docket Entry No. 72), this motion is alternatively denied as moot.

Williams has replied.  (Docket Entry No. 142).

This court agrees that summary judgment in Williams's favor is appropriate on CORs 23.1, 26, and 27.  Article 2.7 of the contract includes a "sole and exclusive remedy" clause limiting Technip's damages to the remedies outlined in Articles 2.4, 2.5, and 2.6.  (Contract at 5–6).  These remedies include tolling the deadline by which Technip had to achieve "substantial completion" and alternative vessel costs in excess of $275,000 per day in the event the *Deep Blue* was not available.  (*Id.*).  These remedies do not include additional costs incurred in the event of a delay in the SPAR Access Date.  To the contrary, Article 2.7 specifically excludes all damages "which may result because of delays in the SPAR Access Date or delays encountered by CONTRACTOR from other contractors and/or their subcontractors working on the SPAR."  (*Id.* at 6).  CORs 23.1, 26, and 27 (Docket Entry No. 121, Exs. 5, 7,8) all request damages resulting from SPAR access delay.  They are precluded under the contract.  Williams's motion for summary judgment on the claims based on CORs 23.1, 26, and 27 is granted.[5]

The contract similarly mandates entry of summary judgment in Williams's favor on CORs 24 Revision 1 ("24.1") and 25.  Williams argues that Article 2.7 bars the amounts Technip seeks through these CORS because those amounts are damages from delays caused by third-party contractors.  (Docket Entry Nos. 131 at 27–29, 142 at 7).  Technip contends that these injuries are compensable under Article 8.4 as delays under the contract.  (Docket

---

[5]  Because of this decision, this court need not address the parties' arguments related to the BAR insurance issue raised in COR 23.

34

Entry No. 136 at 17).  In the alternative, Technip again argues that Williams never established a valid SPAR Access Date, as necessary for Article 2.7 to apply.  (*Id.* at 19–20).  Because this court has already rejected the alternative argument, the issue is whether Article 2.7 or Article 8.4 governs the damages Technip requested in CORs 24.1 and 25.

Article. 2.7 excludes damages that "may result because of delays in the SPAR Access Date or delays encountered by CONTRACTOR from other contractors and/or their subcontractors working on the SPAR."  (Contract at 6).  The parties do not dispute that the damages claimed in CORs 24.1 and 25 resulted from delays from third-party contractors.  These damages are precluded under Article 2.7 unless a separate contract provision applies.  Technip argues that Article 8.4 applies to permit recovery of such damages.  Article 8.4, entitled "Delays," begins with the phrase, "Except as set forth in Article 2.7 hereinbefore, COMPANY shall grant a time extension and compensate CONTRACTOR at the Standby Rate or rate schedule in Exhibit E, whichever is applicable, for all delays incurred by CONTRACTOR or its subcontractors arising out of or related to any of the following delays . . ." (*Id.* at 17).  Article 8.4 specifically exempts the application of Article 2.7 in the situation described in CORs 24.1 and 25—delays caused by third-party contractor interference with Technip's SPAR access.  Williams's  summary judgment motion on these claims is granted.

In the alternative, this court agrees with Williams that Technip's claims based on CORs 23.1, 24.1, 26, and 27 are barred as a matter of law because Technip failed to comply with Article 8.5.2, which required Technip to provide Williams with supporting documentation for all additional claims.  Article 8.5.2 reads, in pertinent part, "Any amounts

not part of the Contract Sum (including, without limitation, Extra Work) shall be separately stated and shall include the applicable time sheets, vendor's and subcontractor's invoices, equipment time slips and/or receipts."  (Contract at 18).  Technip's contention that this provision does not apply to the CORs is unpersuasive.  The contract defines "Extra Work" as "Work for which a Change Order is authorized pursuant to Article 3.3.2."  (*Id.* at 2).  Each "Change Order Request" submitted by Technip is subject to the Article 8.5.2 requirements. Undisputed evidence in the summary judgment record shows that Technip failed to include the documentation necessary to support the CORs at issue in this motion.  (*See, e.g.*, Docket Entry No. 121, Ex. 3 at 46, 80, 125, 126, 129, 131, 145).  In response to Williams's motion for summary judgment on this ground, Technip failed to point to record evidence that shows compliance with Article 8.5.2, providing an alternative basis to grant Williams's motion for summary judgment on CORs 23.1, 24.1, 26, and 27.

## III.    Conclusion

The motions to exclude the expert witnesses are granted.  Technip's motion for leave to file an amended answer is denied.  The motions for summary judgment are granted in part and denied in part.[6]  This case is ready for trial on the issue of when Williams gave Technip "full access" to the SPAR and the damages "consequences."

---

[6] Technip asks that if this court rules in Williams's favor on the availability of liquidated damages, this court stay the proceedings and permit Technip to reopen discovery into whether the liquidated damages provision is an unenforceable penalty.  (Docket Entry Nos. 92 at 13; 99 at 7–8).  This motion is denied as moot.

At the final pretrial conference scheduled for **April 28, 2006**, this court will address any remaining issues to be resolved and set a trial schedule.

SIGNED on March 7, 2006, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge