## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

TECHNIP OFFSHORE CONTRACTORS, §
§
          Plaintiff,       §
§
v.                       §       CIVIL ACTION NO. H-04-0096
§
WILLIAMS FIELD SERVICES, *et al.*, §
§
          Defendants.   §

## MEMORANDUM AND OPINION SETTING OUT
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.    Background

This diversity case arises out of a contract for work on the Devil's Tower SPAR Development Project, a floating oil and gas production facility in the United States Gulf of Mexico off the Louisiana coast. On August 13, 2001, Technip Offshore, Inc. and Williams Field Services-Gulf Coast, L.P. and Williams Oil Gathering, L.L.C. ("Williams"), entered into a $190 million contract for the "Engineering, Procurement, Installation, and Commissioning of Gas Export Pipeline and Oil Export Pipeline" tied into the SPAR (the "EPIC Contract"). Dominion Exploration & Production was the project manager and was to operate and manage the drilling rigs. Dominion contracted with SparTEC, Inc., an affiliate of J. Ray McDermott, Inc., to fabricate the SPAR, and with Pride Drilling to drill the wells. Dominion contracted with Williams to lay gas and oil pipelines and attach the pipelines to the SPAR. In the August 2001 EPIC Contract, Williams contracted with Technip to

engineer, procure, install, and commission the gas and oil pipelines.  This work required the installation of two steel catenary risers ("SCRs") to connect the pipelines to the SPAR.  In order to connect the SCRs to the SPAR, Technip had to fabricate a winch system and install it on the SPAR deck.

The project encountered numerous difficulties and delays, most unrelated to Technip's work.  Technip filed change orders seeking additional compensation, some of which Williams refused to pay.  In January 2004, Technip filed this suit, alleging that Williams had breached the EPIC Contract and seeking a declaratory judgment as to the parties' contractual rights and duties.  Williams answered and counterclaimed for breach of contract.

The parties subsequently settled a number of their claims.  In earlier memoranda and opinions, this court dismissed or granted summary judgment as to certain other claims.  (*See* Docket Entry Nos. 76, 147, 154, 171).  The only remaining claim is Williams's claim for liquidated damages under Article 23.5.1 of the parties' EPIC Contract.  This memorandum and opinion sets out findings of fact and conclusions of law following the bench trial on the liquidated damages issue.

Article 23.5.1 of the EPIC Contract states that if Technip does not achieve substantial completion of its work by the later of either March 2, 2003 or the SPAR Access Date plus fifty-one days, Williams is entitled to liquidated damages at a specified daily rate.  The Contract defines "SPAR Access Date" as the date "upon which [Technip] shall be provided full access to commence Work at the SPAR in accordance with the requirements of Article 2.0."

The first issue presented by Williams's liquidated damages claim is when the SPAR Access Date occurred.  The parties agree that Technip achieved substantial completion of its work on April 22, 2004.  The parties dispute the day of the SPAR Access Date, which began the fifty-one day period before liquidated damages accrued.  Williams asserts that the SPAR Access Date occurred on January 27, 2004, the day after SparTEC substantially completed its work on the SPAR and removed its personnel.  Using a January 27, 2004 SPAR Access Date and adding the fifty-one days set out in the Contract, Technip was thirty-six days late.[1] Under the Contract, Williams was entitled to $100,000 per day for the first thirty days of delay and $200,000 for the last five days.  Williams seeks $4.2 million in liquidated damages for the thirty-six days.[2]

Technip disputes that it had "full access" to the SPAR on January 27, 2004.  Technip acknowledges that it received access to the SPAR to install and set up the winch system on February 9, 2004.  That was the date that Williams delivered to the SPAR the winch system that Technip had fabricated, along with Technip's personnel who would supervise the installation.  The winch system had to be installed and set up on the SPAR before the work necessary to connect the pipelines to the SPAR could proceed.  Technip asserts that such access to the SPAR was not "full access" because Williams failed to provide services and

---

[1]  The correct number of days between January 27, 2004 and April 22, 2004 is 87 rather than Williams's proposed 86.  Because 2004 was an intercalary year, the month of February had 29 days rather than the usual 28.  Williams appears to have overlooked February 29, 2004 in its proposed findings of fact and conclusions of law.

[2]  Williams actually alleges only $4 million in liquidated damages, presumably overlooking the extra day in February 2004.

equipment specified in Exhibit B, Section 4.8 of the Contract.  Technip complains that because Williams did not provide a power source (Technip had to bring its own generator), did not provide a deck of adequate strength to support the winch system (Technip had to reinforce parts of the deck), and did not provide clear access to agreed areas of deck space for the winch system (Technip had to move some equipment), Williams provided "access" to the SPAR on February 9, 2004, but not "full access."  Technip asserts that the services and equipment were not fully in place until February 18, 2004.  Technip alternatively asserts that because it had to install the winch system offshore rather than onshore, as it preferred, the SPAR Access Date could not occur until after the winch system was installed on the SPAR and operable, which occurred on February 18, 2004.  According to Technip, it owes at most $1.3 million in liquidated damages.

The second issue is whether Technip is entitled to an extension of the fifty-one day period after the SPAR Access Date because Williams did not provide all SPAR services and equipment required under Exhibit B, Section 4.8 of the Contract.  Technip asserts that if the SPAR Access Date is February 9, 2004, Williams's failure to provide power for the winch installation and clear access to decks of sufficient strength for the winch system entitled Technip to an extension to at least February 18, 2004.  Williams denies that there were any delays that it is responsible for under the Contract.

Technip also asserts that it is entitled to additional extensions because of delays caused by Williams or affiliated entities after the SCRs were hooked up, precluding any liquidated damages award.  Technip also asserts that the SPAR Access Date could not occur

4

until after the SCRs were connected to the SPAR.  Additionally, Technip disputes that the liquidated damages provision is enforceable or applicable.

This court held a bench trial to decide the liquidated damages claim.  This court heard testimony from David Adkins, Dominion's production superintendent, who was present on the SPAR during much of the period at issue; Guy Suffridge, Williams's business development manager who worked on deep-water pipelines; Jim Mann, a Williams deep-water project manager; and Paul Thompson, Technip's project manager for deep-water projects, who was not present at the SPAR but who represented Technip during many of the communications and discussions.  The parties introduced numerous exhibits, arguments of counsel, and proposed findings and conclusions.  (Docket Entry Nos. 184, 185, 196).

Based on the pleadings, the record, the live testimony and exhibits, and the parties' arguments, this court enters the findings of fact and conclusions of law that are set out below. The result is to find and conclude that the liquidated damages provision is enforceable and applicable to this case; that the SPAR Access Date was February 9, 2004; and that Technip is not entitled to any extensions of the fifty-one day period following the SPAR Access Date. Based on the findings and conclusions set out below, Williams is entitled to recover liquidated damages in the amount of $2.3 million.

Williams is ordered to submit a proposed final judgment no later than March 28, 2007.

## II.     Findings of Fact[3]

---

[3]  To the extent that any of the findings of fact is a conclusion of law, it should be considered as a conclusion of law.

5

A.      **The Contract Provisions**

Williams (referred to as "COMPANY") and Technip (referred to as "CONTRACTOR") entered into a Contract for "Engineering, Procurement, Installation, and Commissioning of Gas Export Pipeline and Oil Export Pipeline" effective August 13, 2001.

Article 2.3 of the Contract specified Technip's duty to be ready to work according to the Contract schedule:

> CONTRACTOR shall ensure that CONTRACTOR's vessels, equipment and personnel are at the Work site and ready to commence offshore installation and COMPANY shall ensure that COMPANY has procured all of its permits and access rights such that the pipelines can be installed in a timely manner in accordance with the schedule for the Work. In order to assist COMPANY with the performance of its own scheduling obligations, CONTRACTOR shall provide written notification monthly to COMPANY of the commencement date for the offshore installation work by identifying periods during which the offshore installation work shall commence.

The Contract set a four-month window, from November 15, 2002 to March 15, 2003, within which Williams anticipated Technip would have full access to the SPAR in order to begin work. The Contract defined this date as the SPAR Access Date: "[t]he date upon which the CONTRACTOR [Technip] shall be provided full access to commence Work at the SPAR in accordance with the requirements of Articles 2.0." Article 2.4 required Williams to provide Technip a series of notices as the SPAR Access Date approached, giving progressively more precise information as to when Technip would have access to the SPAR.[4]

---

[4] Specifically, Article 2.4 provided:

> In order to assist CONTRACTOR in interfacing CONTRACTOR's Work with the installation of the SPAR, which shall be performed by others, COMPANY shall provide

The serial notice requirement was to facilitate Technip's ability to coordinate its work with that of others involved in installing the SPAR.  Because of delays not involving Technip, the SPAR Access Date did not occur by March 15, 2003, the latest calendar date specified in Article 2.4.  Williams failed to provide Technip with access to the SPAR until after March 15, 2003.

_____

written notification to CONTRACTOR identifying windows which contain the SPAR Access Date and, finally, notifying  CONTRACTOR of the SPAR Access Date.  In the event CONTRACTOR is unable to meet the SPAR Access Date, or COMPANY needs to issue a window outside the window established by 2.4(d) but still within the overall window identified in 2.4(a), then both COMPANY and CONTRACTOR shall mutually agree to a new SPAR Access Date which shall not be later than the window identified in 2.4(a).

(a)     On the effective date of this Contract, the window containing the SPAR Access Date shall be November 15, 2002 to March 15, 2003.

(b)     On January 1, 2002, COMPANY shall notify CONTRACTOR of a sixty (60) day window for the SPAR, such sixty (60) day window to be entirely within the prior window.

(c)     Six (6) months prior to the midpoint of the above sixty (60) day window, COMPANY shall notify CONTRACTOR of a forty-five day window for the SPAR, such forty-five (45) day window to be entirely within the prior window.

(d)     Four (4) months prior to the midpoint of the above forty-five (45) day window, COMPANY shall notify CONTRACTOR of a thirty (30) day window for the SPAR, such thirty (30) day window to be entirely within the prior window.

(e)     Three (3) months prior to the midpoint of the above thirty (30) day window, COMPANY shall notify CONTRACTOR of a fifteen (15) day window for the SPAR, such fifteen (15) day window to be entirely within the prior window.

(f)     Two (2) months prior to the midpoint of the above fifteen (15) day window, COMPANY shall notify CONTRACTOR of a seven (7) day window for the SPAR, such seven (7) day window to be entirely within the prior window.

(g)     One (1) month prior to the midpoint of the above seven (7) day window, COMPANY shall notify CONTRACTOR of a three (3) day window for the SPAR, such three (3) day window to be entirely within the prior window.

Article 2.6 addressed the situation in which the SPAR Access Date fell outside the November 2002 to March 2003 window. Article 2.6 recognized that in that event, Technip's special-purpose vessel needed to hook-up the SCRs to the SPAR, the *Deep Blue*, might be employed with another Technip customer. Article 2.6 stated:

> Notwithstanding the foregoing, in the event the date upon which the CONTRACTOR is provided access to commence the Work at the SPAR is not between November 15, 2002 and March 15, 2003, and CONTRACTOR's Deep Blue is actively working for another of CONTRACTOR's customers during such time, then CONTRACTOR shall obtain another vessel to complete the lift and installation of the pipeline risers and shall be reimbursed by COMPANY for such alternate vessel costs, if any, that are in excess of $275,000 per day. CONTRACTOR and COMPANY shall work together to solve this problem, should it arise, and every effort will be made to secure an alternative vessel that does not exceed $275,000 per day. CONTRACTOR shall bear all of CONTRACTOR's interface related costs, if any.

Under Article 2.7, Technip's remedies "for costs . . . which may result because of delays in the SPAR Access Date" were limited to those set out in Articles 2.4, 2.5, and 2.6:

> The remedies provided to CONTRACTOR in Articles 2.4, 2.5 and 2.6 above shall be CONTRACTOR's sole and exclusive remedy for costs, including but not limited to Standby Rate Charges, which may result because of delays in the SPAR Access Date or delays encountered by CONTRACTOR from other contractors and/or their subcontractors working on the SPAR.

Article 2.5 sets out Williams's duties for preparatory work:

> Further to the SPAR Access Date as determined in accordance with Article 2.4 above, COMPANY shall ensure that all SPAR services and equipment, as detailed in Exhibit B, Section 4.8, are ready in all ways for use by CONTRACTOR to perform the SPAR Installation operations. In the event such services and

equipment are not available for use by CONTRACTOR, then CONTRACTOR shall not be entitled to standby rates for its vessels and equipment, however, CONTRACTOR shall be entitled to an extension of time to the period described in 23.5.1(a) equal to the period of such a delay caused by the non-availability of such SPAR services and equipment.

Exhibit B to the Contract sets out the scope of Technip's work. Section 3 of Exhibit B stated that Technip was "responsible for design, purchase, delivery, fabrication, installation and pre-commissioning of the proposed pipelines and subsea equipment to deliver a complete and tested facility." Technip's work included "[a]ll activities and services associated with onshore fabrication and offshore installation," "[a]rrange for equipment/material transportation and temporary storage," and "[f]abricate and install the pipelines and equipment." Exhibit B, § 3.4. The Contract also required Technip to procure and supply all installation aids for the SCR, including but not limited to the "SCR pull-in winch and snatch blocks on the SPAR (including installation)." *Id*., § 4.3.3. Techip was also "responsible for all interface management for the activities required on the SPAR . . . in relation to its work, during the engineering and installation phases of this project." *Id.*, § 4.8.1.

Section 4.8.2 of Exhibit B outlined the scope of Technip's responsibilities for the SCR installation. The Contract stated that Technip was to supply the pull-in winch system, noting Technip's preference to install and test the winch system on the SPAR onshore, "off the critical path." Williams (or Dominion) was to provide the following services with respect to "Winch Installation Services":

 • Clear access to agreed areas of deck space of adequate space for winch and required snatch blocks.

9

- Practical access to necessary yard facilities including crane, to install all equipment.

- Use of yard construction personnel.

- Access for [Technip] personnel.

Section 4.8.2 of Exhibit B also required Williams to provide the following services and equipment:

- Power and services to pull-in winch.

- Permission to operate winch and re-route wire as required.

- SPAR crane assistance with operator.

- Accommodation for required personnel (Approximately 9 off).

- Clear access for the Hook up vessel.

Article 23.5.1 of the Contract sets out the liquidated damages provision:

> Should CONTRACTOR fail to achieve Substantial Completion of the Work by the later of either 02 March 2003 or the SPAR Access Date plus fifty-one (51) days, the COMPANY may assess as liquidated damages (LD), but not as a penalty, an amount of money per day equal to the LD value calculated in accordance with the mechanism below, for every day that the Work is not so completed, but only up to and not in excess of the aggregate maximum amount of ten percent (10%) of the Contract Sum, above which amount COMPANY agrees to release CONTRACTOR.  For purposes of this clause, the fifty-one (51) day schedule will not be extended by events of Force Majeure in Article 20.0, except to the extent the aggregate of Force Majeure days occurring prior to the SPAR Access Date exceeds fifteen (15) days.

10

| Day of delay | LD Value per Day ($) |
|---|---|
| 01-30 | $100,000 |
| 31-60 | $200,000 |
| 61-75 | $300,000 |

Article 23.5.2 provided that the liquidated damages provision was the parties' sole remedy:

> COMPANY and CONTRACTOR agree that the liquidated damages assessed under 23.5.1 above represent the reasonable pre-estimate of COMPANY's actual damages, which are difficult or impossible of calculation and that the terms applicable to liquidated damages in this Article are COMPANY's sole and exclusive remedy for any late delivery of the Work.

## B.    The Delivery of the Winch System to the SPAR:  The SPAR Access Date

The Devil's Tower SPAR is an oil and gas production facility floating in the Gulf of Mexico 180 miles southeast of New Orleans, Louisiana.  The Gulf waters near the SPAR measure approximately 6,400 feet deep.  The SPAR is comprised of a topside (deck), hull, and mooring system that connects the SPAR to the seabed.  Dominion served as the project manager for the construction of the Devil's Tower SPAR.  Dominion contracted with Pride to complete and drill the wells for the SPAR.  Dominion and Pioneer contracted with SparTEC to fabricate the SPAR.  Dominion contracted with Williams to lay the oil and gas pipelines and to attach these pipelines to the SPAR.  Williams in turn contracted with Technip to engineer, procure, install, and commission the oil and gas pipelines.  Technip was required to build a large winch system and install it on the SPAR, which was used to lift and hang two Steel Catenary Risers ("SCRs") to connect the oil and the gas pipelines to the

11

SPAR.  The SCRs were specially engineered to move with the ocean movements of the SPAR.  The winch system included a large pull-in winch and two lateral winches that had to be designed, fabricated, and installed on the SPAR deck in order to lift and set the SCRs.  The installation required the fabrication and installation of load-spreading devices and the installation of padeyes on the SPAR deck to connect the SCRs to the SPAR.

After the winch system was installed and tested and the SCRs had been hung, Technip attached oil and gas pipelines on the ocean floor to the SPAR, using the SCRs as the connectors.  Technip used its special-purpose vessel, the *Deep Blue*, for this work.  Technip then commissioned and tested the pipelines to prepare them to accept hydrocarbons.  That work was substantially completed on April 22, 2004.

Technip had to have access to the SPAR to do its work of installing the SCRs, which required an installed and operating winch system.  The issues are when Williams provided Technip with that access and whether Technip's work was delayed after that.

In December 2003, SparTEC was approximately eleven months behind schedule with the SPAR fabrication.  Because of the way in which the parties drafted the EPIC Contract's diminishing-window notice provision, there was not a notice requirement under that provision in the event the SPAR Access Date came later than March 2003.  Technip asserted that Williams was nonetheless required to set the SPAR Access Date using the Article 2.4 countdown mechanism or a similar mechanism.  This court previously held that Williams was not obligated to do so.  (Docket Entry No. 76).  Moreover, the fact that the diminishing-window provision did not apply did not make the liquidated damages provision inapplicable.

12

Instead, Article 23.5.1 allows for liquidated damages at preset daily rates if Technip did not achieve substantial completion of its work by the later of either March 2, 2003 or the SPAR Access Date plus fifty-one days, unless there were delays that extended the fifty-one day period.

Williams contends that the SPAR Access Date was January 27, 2004, when SparTEC substantially completed its work and its personnel were "demobilized," making way for Technip to do its work on the SPAR. Williams contends that Technip delayed in providing notice that the winch system was ready to be picked up and brought to the SPAR after that date because Technip had committed the *Deep Blue* to other customers and the vessel would not be available until mid-March 2004. Williams emphasizes that as late as January 14, 2004, Technip was threatening to delay delivery of the winch system until Williams agreed to a new countdown window that would allow it to ensure the *Deep Blue*'s availability. Technip denies that the SPAR Access Date occurred on January 27, 2004 and denies any delay in notifying Williams that the winch was ready to be picked up and taken to the SPAR. Instead, Technip asserts that it did not have any access to the SPAR—much less "full access"—until Williams picked up the winch system and delivered it and the Technip personnel to the SPAR. Technip argues that Williams did not provide notice that it was ready to pick up the winch system for delivery to the SPAR until February 5, 2004.

In the fall of 2003, Williams and Technip communicated about when the winch system would need to be available for installation on the SPAR. Although Technip took the position that it would not accept a SPAR Access Date unless it was set under an agreed

13

countdown mechanism, (*see* Williams Exhibits 3, 19, 31, and 33), Technip had the fabricated winch system in Mobile, Alabama on December 16, 2003.  Except for the completion of the cellar-deck load spreaders, which were ready on January 26, 2004, the winch system was ready for transport beginning on December 22, 2003.  Technip informed Williams before Christmas 2003 that the winch system was in Alabama waiting delivery to the SPAR.  In a January 9, 2004 memorandum, Technip again informed Williams that the winch system was in Alabama awaiting delivery to the SPAR.  Technip continued to work during this period on the completion of the cellar-deck load spreaders, which were part of the equipment required for the SCR pull-in.  The load spreaders were completed on January 26, 2004.

The Contract provided that Technip was responsible for getting the winch system from the mainland to the SPAR, but Williams later agreed to make the delivery.  Although Williams asserts that the SPAR Access Date was January 27, 2004, the date that SparTEC achieved substantial completion, Williams did not notify Technip that it was ready to transport the winch system until February 5, 2004.  Williams was to provide Technip two days' notice that it would have a vessel, the *Mr. Sage*, pick up the winch system and the Technip personnel needed to install the system on the SPAR, and take them to the SPAR.  Although Williams asserted that it was ready to pick up the winch system any time after January 27, 2004, the evidence does not show that it told Technip when it would be coming or that it provided a plan for loading and transporting the winch system before February 5, 2004.  The evidence shows that during the period that Williams asserts it was able to pick up the system, the *Mr. Sage* was not in fact available to do so.  Williams directed the *Mr. Sage*

14

to assist SparTEC during the demobilization, including on January 30, 2004, and picking up equipment, including on February 1, 2004. Williams did not notify Technip that the *Mr. Sage* would come to pick up the winch system until February 5, 2004. The *Mr. Sage* arrived to pick up the winch system on February 7, 2004, and delivered the winch system to the SPAR on February 9, 2004.

Jim Mann, Williams's manager of deep-water projects, testified that the delay in picking up the winch system from January 27 to February 7, 2004 was at Technip's request. Mann's testimony in this regard is not credible. Williams relies on a document (Williams Exhibit 46) purporting to show that Paul Thompson at Technip had requested a delay in delivering the winch system to the SPAR until February 4 or 5, 2004. Thompson credibly testified that he had never seen this document before trial and had not requested the delay. Rather, Dominion was asking for the delay in order to place some of their equipment—jumpers and umbilicals—on the SPAR. The *Mr. Sage* was used to deliver that equipment. The evidence shows that Williams did not notify Technip that it would be picking up the winch system until February 5, 2004. On February 5 and 6, Williams provided Technip the deck plan to ship the winch system on the *Mr. Sage* to the SPAR. The loading of the winch system on the *Mr. Sage* began on February 7, 2004. Moreover, Williams's letter dated December 31, 2003, (Williams Exhibit 24), which purports to establish a SPAR Access Date of January 22, 2004, contradicts Williams's own documentation and testimony showing that SparTEC personnel and equipment remained on the SPAR until January 31, 2004. The winch system arrived on the SPAR on the morning

of February 9, 2004.  Jim Mann's testimony that the SPAR was available and accessible to Technip on January 27, 2004 was not credible.  It contradicted his own testimony as well as the credible testimony of Paul Thompson and the documentary evidence.[5]  The SPAR Access Date could not be before February 9, 2004.

### C.     The Installation of the Winch System:  "Full Access" to the SPAR

#### 1.     *The Impact of Offshore Winch System Installation on the SPAR Access Date*

Technip installed the winch system from February 9 to February 18, 2004.  Technip argues that because the winch system was installed offshore, rather than in accordance with its contractually stated preference to install the winch system on the SPAR onshore, the SPAR Access Date did not occur until the winch system was installed.  The Contract did not require that Technip be allowed to install the winch system on the SPAR onshore.  Section 4.8.2 of the Contract states that onshore installation of the winch is a "preference," not a requirement.  Technip was informed that it would be installing the winch system offshore shortly after it signed the Contract in August 2001.  Technip sought reimbursement for work

---

[5] Williams argues that this court should give no weight to Paul Thompson's trial testimony because it was inconsistent with his deposition testimony as Technip's designated corporate representative under Rule 30(b)(6).  Courts have precluded trial testimony of witnesses who were deposed under Rule 30(b)(6) as a sanction for wholly inadequate preparation of the witness or for other violations of the rule.  *See Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 269 (2d Cir. 1999) ("When a party fails to comply with Rule 30(b)(6), Rule 37 allows courts to impose various sanctions, including the preclusion of evidence.").  Neither Rule 30(b)(6) nor Rule 37, however, requires a court to preclude or disregard inconsistent trial testimony by the same witness.  Rather, such inconsistencies are to be judged by the fact finder in assessing the witness's credibility.  *See Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 753 (7th Cir. 2002) (stating that a party is free to contradict her deposition testimony at trial, but her opponent may introduce her prior statement as impeachment evidence).  Williams does not provide a persuasive basis for disregarding Thompson's testimony as to the facts (as opposed to his testimony as to the meaning of the Contract).

related to the offshore (as opposed to onshore) installation in Change Order Request #16 and asserted a breach of contract claim arising out of the denial of that change order in this suit. Technip and Williams settled this claim and it was dismissed with prejudice in February 2005. (Docket Entry No. 70).

Technip argues that although any claim for additional compensation or damages because of the offshore installation of the winch has been dismissed, liquidated damages should not be assessed until after the winch was installed. This argument finds no basis in the Contract. Although the Contract expressed Technip's preference for installing the winch system onshore, that was not required. Williams informed Technip shortly after signing the Contract in August 2001 that it would be installing the winch system offshore. The fact that the winch system was installed offshore does not provide a basis for finding that the SPAR Access Date did not begin until after the winch was installed on February 18, 2004. Rather, the Contract defines the SPAR Access Date as when Technip had "full access to commence Work at the SPAR in accordance with the requirements of Article 2.0." Technip's "Work" is described in Exhibit B to the Contract. Section 3.0 of Exhibit B provides that Technip is "responsible for design, purchase, delivery, fabrication, installation and pre-commissioning of the proposed pipelines and subsea equipment to deliver a complete and tested facility." Section 3.4 states that Technip's work includes "[a]ll activities and services associated with onshore fabrication and offshore installation." Section 4.3.3 requires Technip to supply installation aids, including the "SCR pull-in winch and snatch blocks on the SPAR (including installation)." Section 4.8.2 of Exhibit B requires Technip to supply and install the winch

system on the SPAR.  Williams did not assume responsibility for any of Technip's duties for installing the winch system installation other than transporting the winch system to the SPAR.  The fact that Technip installed the winch system offshore rather than onshore, as it preferred, does not mean that it was not provided full access to the SPAR until after the winch system was installed and operational.  Such a conclusion is in conflict with the plain meaning of the Contract.

> 2.    *The Impact of Issues Relating to Power and Clear Access to Deck Space of Adequate Strength on the SPAR Access Date*

Under Article 2.5 of the Contract, Williams was required to provide Technip the services and equipment set out in Exhibit B, Section 4.8, "ready in all ways for use by [Technip] to perform the SPAR Installation operations."  The failure to provide all the necessary services and equipment did not delay the SPAR Access Date, but did entitle Technip to an extension of the fifty-one day period set out in Article 23.5.1.  Under Article 2.5, the length of the extension is determined by length of the delay.

Technip acknowledges that Williams provided it access to the SPAR to install the winch system on February 9, 2004.  Williams did not, however, provide all the services and equipment necessary for Technip to install the winch system.  Under Exhibit B, Section 4.8 of the Contract, Williams was required to provide the following services to avoid an extension of the fifty-one day period:  clear access to agreed areas of deck space of adequate strength for the winch and blocks; power to operate the winch; permission to operate the winch and reroute wire as required; SPAR crane assistance with an operator; accommodation

18

for required personnel; and clear access for the *Deep Blue*, the hook-up vessel. Technip asserts that because of these failures, it did not have "full access" to the SPAR to perform its work until February 18, 2004, when the winch system was fully installed and operational.

The evidence shows that parts of the SPAR deck were not of adequate strength to support the winch system, requiring Technip to make some structural modifications so the deck could support the winch system. The evidence also shows that there were some items and equipment that blocked clear access to areas of deck space necessary to install the winch system. Technip had to move some of these items and equipment. The evidence shows that Technip had to bring a generator to the SPAR to install the winch system, although it is unclear that Technip advised Williams of any problem with the power systems available on the SPAR. Technip asserts that as a result of these problems, it did not have "full access" to the SPAR to install the winch system until the winch system was in fact installed on February 18.

The Contract does not define "full access" as beginning when Williams complied with its preparatory duties set out in Article 2.5 and Exhibit B, Section 4.8 of the Contract. Instead, the Contract defines "full access" as when Technip was able to perform its contractually defined "Work" on the SPAR. The Contract allows an extension of the time Technip had to achieve substantial completion before incurring liquidated damages for delays resulting from Williams's failures to comply with its preparatory duties set out in Exhibit B, Section 4.8.

The evidence shows that Technip had "full access" to the SPAR to install the winch

19

system on February 9, 2004.  Technip's witnesses testified that once they had access to the SPAR, it was uninterrupted.  The evidence shows that Technip was able to perform the work they needed to perform in an efficient manner without interruptions or disruptions from the work of other contractors or their personnel.  The SPAR Access Date is February 9, 2004 because on and after that date, Technip had "full access" to the SPAR to perform the "Work" it was required to do under the Contract.

Technip asserts that Williams's failure to provide all the services and equipment required under Exhibit B, Section 4.8 of the Contract extended the fifty-one day period that began on February 9, 2004.  Under the Contract, Technip is entitled to an extension of the fifty-one day period that began on February 9, 2004 if it was delayed in achieving substantial completion because of time required to reinforce the SPAR deck, to resolve interferences, to provide power, and to move items that prevented clear access to parts of the deck necessary for winch installation.  Technip contends that these problems added nine days to the installation of the winch system, extending the fifty-one day period by that amount.

The evidence shows that Technip installed the winch system in nine days, within the period that the installation was expected to take notwithstanding any of the problems that Technip identified.  The evidence shows that the problems did not cause delays in achieving substantial completion.  Technip had to reinforce some areas of the SPAR deck by removing deck plating, putting in additional gusset plates to reinforce structural beams, and replacing the deck plating.  Paul Thompson of Technip testified that this work caused the largest delay. He estimated that it took five days to complete these structural reinforcements.  He also

estimated that it took two days to move items to clear deck space for the winch. However, Thompson acknowledged that much of this work took place at the same time as other work necessary for the winch system installation, making the amount of additional time difficult to determine. He also testified that the Technip Daily Progress Reports would provide the most reliable information as to how much time the specific tasks required. The Daily Progress Reports show that Technip performed the work necessary to reinforce the structural beams on the SPAR deck in 12 hours and 13 minutes. (Technip Exhibit 63). Although some equipment had to be moved before the winch system could be installed, credible evidence, including the testimony of David Adkins of Williams and the Daily Progress Reports, show that moving the equipment took approximately one hour and 15 minutes.

The evidence shows that Technip did bring its own power generators to do its work, including the work of installing the winch system. The power generators on board the SPAR were used for other purposes. The evidence also shows that the Technip generators were available on February 9, 2004 and did not delay either the SPAR Access Date or the installation work after that date.

Thompson testified that the winch system could not be put in the proper place at the outset because of problems with crane access. He stated that this additional movement of the winch system once it was on the SPAR added two days to the work. Technip does not, however, identify any entries in the Daily Progress Reports to provide the necessary support for this contention.

The evidence shows that there were no delays resulting from a failure to provide beds

to Technip personnel on the SPAR, failure to provide crane assistance or a crane operator, or failure to provide access to the *Deep Blue*.

At most, the fifty-one day period would be extended by thirteen hours and twenty-eight minutes as a result of delays in installing the winch system due to Williams's failure to provide all the services and equipment under the Contract.  Williams asserts that there is no extension available because any failure on its part to provide the services and equipment specified in Exhibit B, Section 4.8 did not delay Technip in achieving substantial completion. Williams argues that because the *Deep Blue* was not available until March 22, 2004, any delays between the SPAR Access Date of February 9 and installing and commissioning the winch system on February 18 did not affect substantial completion, which occurred after the *Deep Blue*'s arrival.   The testimony and evidence show that problems in Williams's preparation of the SPAR services and equipment caused some delay in installing the winch system after it was delivered to the SPAR.  The winch system had to be installed before the work necessary for hooking-up the SCRs could take place.  But the credible testimony and evidence in the record show that even if the winch system had been installed and commissioned between February 9 and February 18, 2004, substantial completion would not have occurred earlier because the *Deep Blue* would not have been available earlier.  The *Deep Blue* did not arrive to begin the SCR pull-in work until March 22, 2004, and Thompson testified that it could not have been available earlier than mid-March 2004.

The SPAR Access Date was February 9, 2004.  Under Article 2.5, Technip could have received no more than a 13 hour and 28 minute extension in the fifty-one day period allowed

22

before liquidated damages applied as a result of delays caused by Williams's failure to provide the services and equipment. But because the *Deep Blue* was not available until March 22, 2004, Technip cannot show that this failure resulted in a delay in achieving substantial completion after the SPAR Access Date occurred so as to extend the fifty-one day period.

3.   *The Argument that the SPAR Access Date Did Not Occur until the SCRs Were Hooked-Up and Commissioned*

Technip contends that it is not obligated to pay any liquidated damages because the SPAR Access Date could not occur until after the SCRs were connected to the SPAR, which occurred when Technip began its commissioning work on April 1, 2004. This argument finds no support in the Contract or the evidence. The liquidated damages provision does not only apply to the commissioning phase. The commissioning phase did not begin until the SCRs were installed. The SCR installation is defined as part of the "Work" detailed in Exhibit B of the Contract. The SPAR Access Date is defined as the date on which "full access" is provided to Technip to perform the "Work" defined in the Contract, which is not limited to the commissioning of the SCRs.

After obtaining SPAR access on February 9, 2004, Techip achieved substantial completion of its work on April 22, 2004. There were no delays that extended the fifty-one day period after the SPAR Access Date. The liquidated damages owing are $2.3 million.[6]

---

[6] As noted above, because February 2004 had 29 days, the liquidated damages claim is $2.3 million.

III.    **Conclusions of Law**[7]

This court has previously held that Technip waived its affirmative defense that the liquidated damages provision was an unenforceable penalty, because Technip did not move for leave to amend to assert the defense until it had filed four replies to Williams's counterclaim and after discovery had ended.  Technip failed to plead or argue that the provision is an unenforceable penalty in a timely manner.  (Docket Entry No. 140, 154).

Moreover, the liquidated damages provision in Article 23.5 of the Contract is enforceable under Texas law.  The Contract included a joint stipulation that the liquidated damages provision represents the "reasonable pre-estimate of the COMPANY's actual damages, which are difficult or impossible of calculation."  Such a stipulation supports the enforceability of the clause.  *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (stating that to enforce a liquidated damages clause, the court must find that the harm caused by breach is incapable or difficult of estimation and that the amount of liquidated damages in the contract is a reasonable estimate of just compensation; otherwise, the provision is an unenforceable penalty).

The Contract assessed liquidated damages on the latter of March 2, 2003 or the SPAR Access Date plus fifty-one days if Technip had not achieved substantial completion.  The SPAR Access Date plus fifty-one days was the applicable benchmark because of the delays that pushed the SPAR Access Date beyond March 2, 2003.

---

[7] To the extent any of the conclusions of law is a finding of fact, it should be considered as a finding of fact.

24

The inapplicability of the diminishing window notice mechanism set out in Article 2.4 of the Contract did not make the liquidated damages provision inapplicable or make it unenforceable.

SparTEC did not substantially complete its work on the SPAR and demobilize its personnel and equipment until January 30, 2003.  Williams assumed responsibility to pick up the winch system and the Technip personnel and deliver them to the SPAR.  Williams did not notify Technip that it was ready to transport the winch system and personnel until February 5, 2004, and did not deliver the winch system and the personnel to the SPAR until February 9, 2004.  The SPAR Access Date was February 9, 2004.

Article 2.5 and Exhibit B, Section 4.8 of the Contract provided for an extension in the fifty-one day period after the SPAR Access Date for delays resulting from Williams's failure to provide systems and equipment necessary for the winch installation and SCR hook-up and installation.  Although there were SPAR deck areas that required clearing and reinforcing to install the winch system, and although Technip had to provide power on the SPAR for its work, neither the additional work necessary to move equipment, to reinforce the decks to make them of adequate strength, nor to provide power resulted in delays that extended the fifty-one day period under the Contract.

The fact that Technip had to install the winch system offshore rather than onshore, as it preferred, did not delay the SPAR Access Date until the winch system had been installed and was operational.

The SPAR Access Date is not defined by the date Technip began its commissioning

25

work on April 1, 2004.

Technip achieved substantial completion of its work on April 22, 2004.

Under the liquidated damages provision of the Contract, Williams is entitled to $2.3 million in liquidated damages.

## III.    Conclusion

This court will enter judgment in Williams's favor for $2.3 million.  Williams is to submit a proposed final judgment no later than **March 28, 2007.**

SIGNED on March 21, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge